UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  11-20751-CR-SEITZ/SIMONTON

UNITED STATES OF AMERICA,

    Plaintiff,

v.

THOMAS T. COCHRAN,

    Defendant.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

This matter arose upon the Defendant's Motion to Suppress evidence seized during the search of his apartment (DE # 24).  The Honorable Patricia A. Seitz, United States District Judge, referred this Motion to the undersigned Magistrate Judge (DE # 25).  The government responded in opposition (DE # 27).  An evidentiary hearing was held on February 7, 2012.   For the reasons stated below, the undersigned finds and concludes that defendant Thomas Cochran freely and voluntarily consented to the search of his apartment.  Therefore, it is recommended that the Motion to Suppress be **DENIED.**

    I.    **BACKGROUND**

Defendant Thomas Cochran is charged in a three-count Indictment with knowingly possessing a firearm and ammunition affecting interstate and foreign commerce after he had previously been convicted of a felony in violation of 18 U.S.C. § 922(g)(1) and 924(e)(Count 1); possession with intent to distribute cocaine, cocaine base, and oxycodone, in violation of 21 U.S.C. § 841(a)(1) (Count 2); and, possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count

3) (DE # 1).  The Indictment alleges that these offenses all occurred on January 19, 2011 (DE # 1).

In the presently pending Motion to Suppress, the Defendant seeks to suppress the firearm, ammunition, and drugs that were seized from his apartment on January 19, 2011, and which form the basis for these charges.

## II.   THE MOTION TO SUPPRESS

The Defendant contends that the police conducted an illegal warrantless entry and search of his apartment, and that the evidence seized thereafter must be suppressed. He asserts that he gave the keys to his apartment to the police only in acquiescence to their demand after he observed them physically kick down the door of another apartment in his building.  Moreover, he claims that the written consent to search his apartment, which he signed after the alleged illegal entry, was involuntary since it was the product of the illegal entry and not the product of his "free and unconstrained choice" (DE # 24 at 2-3).  At the hearing, based upon his own testimony, the Defendant clarified his position.  He now asserts that he gave his keys to the police in response to the demand by Detective Maury, following which the police searched his apartment without asking for consent at any time.  He claims that later, after he had been formally arrested and transported to the police station, the police ordered him to initial and sign the consent to search form, which he was advised was to protect the property in his house.  In the alternative, the Defendant contends that even assuming the Court believes the testimony of the police officers, the circumstances were unduly coercive such that the consent provided was involuntary.

In response, the Government contends that the Defendant voluntarily consented to the entry into and search of his apartment; and, that his will was not overborne by the

2

fact that the police had chased his companion into another apartment in that building, and forcibly entered that apartment after the companion slammed the door shut in an attempt to flee the police (DE # 27).

### III.     FINDINGS OF FACT

At the evidentiary hearing, the Government called the following witnesses, who are detectives with the City of Miami Police Department: Detective Orestes Guas, Detective Joaquin Perez, and Detective Aquiles Carmona.  The Government also introduced into evidence a photograph of the apartment building where the search was conducted (GX 1), and the consent to search form executed by the Defendant (GX 2). The Defendant testified on his own behalf.

At the outset, based upon the demeanor of the witnesses, and applying common sense, the undersigned credits the testimony of Detectives Guas, Perez and Carmona regarding the circumstances surrounding the search of the Defendant's apartment.  The detectives were forthright in their answers, and candidly admitted when they did not recall certain information.  The testimony provided by the Defendant was internally inconsistent, and did not make sense in certain regards; and, based upon these factors as well as his demeanor, and the fact that he has used an alias in the past, the Defendant was not a credible witness.

The events which led to the arrival of the police at the residence have not been disputed.  On January 19, 2011, detectives assigned to the gang unit of the City of Miami Police Department conducted a narcotics investigation in the Overtown area of the City. The members of this unit who were involved in this investigation included Detectives Brandon Lanier, Joaquin Perez, Orestes Guas, Aquiles Carmona, and Glen Maura. The events which led to the search at issue began when a confidential informant purchased

drugs from Kevin Williams, who was then arrested. Williams agreed to cooperate, identified the apartment building where he obtained his narcotics, and described two individuals who he claimed were his sources–a tall, skinny black man, and a very heavy black man, in his forties or early fifties.

 Detective Lanier drove Williams to the apartment complex, which was located at 223 N.W. 12th Street, Miami, Florida, and Williams identified two persons outside the apartment building as his sources. Detective Lanier advised the other members of his unit that the subjects had been identified at the apartment building. The apartment building is a narrow two-story apartment building with a metal grate door at the outside entrance, which leads into a breezeway area in front of the first story apartments, and a stairwell which leads to the second floor apartments. There are between ten and twelve small apartments in a single row on the first floor. Each apartment has a bedroom/living room area that is about ten feet by twelve feet in size, along with a kitchen and bathroom. The exterior of the apartment building is depicted in Government Exhibit 1. The apartment building is surrounded by a fence.

 The testimony of the detectives differs from the testimony of the Defendant concerning the events which followed the arrival of the detectives at the apartment building. As previously stated, and for the reasons further described herein, the undersigned has credited the testimony of the detectives; and, therefore the following facts are based upon their testimony, which was consistent as to all material facts.

 After Detective Lanier advised the other members of the unit that the suspects had been located at the apartment building, Detectives Perez, Guas, Carmona, Maura, and other detectives not identified at the hearing, drove to that location in three or four unmarked police cars. It was early to mid-afternoon, on a clear day. Detective Perez

arrived first, and saw a person who matched the description of the tall, skinny subject run inside the building as Detective Perez drove his car to the front of the building. Detective Perez, ran up to the metal grate door at the entrance of the building with his gun drawn, and heard a door to one of the apartments slam shut. Believing that the subject had run into apartment # 2, he entered through the unlocked metal grate door, announced his presence by yelling, "Stop. Miami Police!" and kicked in the door to apartment # 2.

The other detectives arrived immediately after Detective Perez. Detective Orestes Guas stationed himself at the door to ensure that nobody else entered or left the building. Approximately five or six other officers entered the building. Detective Maura followed behind Detective Perez, and stood outside apartment # 2 after Detective Perez entered it. Detective Carmona also entered the breezeway area of the apartment building. Detective Lanier remained in his car with Mr. Williams, away from the building.

When Detective Perez entered apartment # 2, he did not see the subject inside that apartment, but there were two women sitting on a bed, and a man sitting in a chair next to the bed. There was a bag containing crack cocaine next to the man. Detective Perez then ordered the three persons to go outside the apartment, and he questioned them to determine the lessee of the apartment. Ms. Willett Hampton was the lessee. She told Detective Perez that the narcotics belonged to the man, Lawrence Amey; and, she signed a written consent to the search of her apartment. Amey was arrested.

At the time the detectives entered the apartment building, Defendant Cochran was sitting in a chair in the breezeway outside one of the apartments, and saw what transpired. Once apartment # 2 was secured, Mr. Cochran and two other persons were told to go outside. Detective Guas patted down Mr. Cochran when he was escorted out

of the building.  The persons ordered out of the building stood next to the fence outside the apartment building, and Detective Guas remained with them.  Detective Guas told them to be patient, and that the police activity would be over soon.  The three individuals were not handcuffed, and were free to move around in the general area.  Detective Guas testified, however, that if Mr. Cochran had tried to leave, he would not have been permitted to do so.  Mr. Cochran did not try to leave; rather, he told Detective Guas that he was on dialysis, and was tired.  Therefore, Detective Guas had a chair brought out so that Mr. Cochran could sit.  Detective Guas engaged in casual conversation with them for about 20 to 30 minutes.   Mr. Cochran was sweating profusely, but did not appear nervous.

Shortly after the detectives entered the apartment building, two marked police cars, with one officer in each car, arrived on the scene as back-up.  Therefore, at all times relevant to the issue of whether Mr. Cochran voluntarily consented to the search of his apartment, there were at least four detectives who, at the time of their entry into the apartment building had their guns drawn; and there were an additional two marked patrol units.

It was clear to the detectives that Mr. Cochran was the second person who had been identified by Mr. Williams as the source of narcotics.  Therefore, approximately 20 to 30 minutes after the detectives arrived, and following the completion of the search of apartment # 2, Detective Carmona approached Mr. Cochran, told Mr. Cochran that he was the subject of the narcotics investigation, and asked if he would consent to a search of his apartment.  Mr. Cochran agreed to the search, and therefore he was provided with a consent to search form.  Detective Carmona explained the form to Mr. Cochran, and gave it to Mr. Cochran to read.  Detective Carmona asked Mr. Cochran if he understood

the form, and ensured that he did. The form, which was admitted into evidence as Government Exhibit 2, is entitled, "Constitutional Rights - Search by Consent." The form contains the following language:

> BEFORE ANY SEARCH IS MADE, YOU MUST UNDERSTAND YOUR RIGHTS.
>
> (1) YOU MAY REFUSE TO CONSENT TO A SEARCH AND MAY DEMAND THAT A SEARCH WARRANT BE OBTAINED PRIOR TO ANY SEARCH OF THE PREMISES DESCRIBED.
>
> (2) IF YOU CONSENT TO A SEARCH, ANYTHING OF EVIDENTIARY VALUE SEIZED IN THE COURSE OF THE SEARCH CAN AND WILL BE INTRODUCED INTO EVIDENCE IN COURT AGAINST YOU.
>
> I HAVE READ THE ABOVE STATEMENT OF MY RIGHTS AND AM FULLY AWARE OF THE SAID RIGHTS.
>
> I HEREBY CONSENT TO A SEARCH WITHOUT WARRANT BY OFFICERS OF THE CITY OF MIAMI POLICE DEPARTMENT OF THE FOLLOWING.

The form then identifies Mr. Cochran's apartment, together with his name and date of birth, and states:

> I HEREBY AUTHORIZE THE SAID OFFICERS TO SEIZE ANY ARTICLE, WHICH THEY MAY DEEM TO BE OF EVIDENTIARY VALUE.
>
> THIS STATEMENT IS SIGNED OF MY OWN FREE WILL WITHOUT ANY THREATS OR PROMISES HAVING BEEN MADE TO ME.

Mr. Cochran then initialed the paragraphs one and two, and signed the form. According to the form, Mr. Cochran was born in 1965, and according to his testimony he has an eleventh grade education. Detective Carmona testified that Mr. Cochran appeared to understand his explanation of the consent to search form, and read the form. Mr. Cochran was very cooperative, calm and did not appear to be nervous. There were no guns drawn; Mr. Cochran was not handcuffed and had not been placed under arrest; and there were no threats or promises made to Mr. Cochran to induce him to consent.

**Detective Perez, who joined them after the form was given to Mr. Cochran, signed as a witness to the execution of the consent form by Mr. Cochran, as did Detective Guas.**

**Following the execution of the consent to search form, Mr. Cochran was asked if he had keys to his apartment. Mr. Cochran then gave his key ring to Detective Perez, who used it to unlock Mr. Cochran's apartment.[1] Detective Perez searched the apartment, and found oxycodone tablets, crack cocaine, and a loaded .38 caliber Smith and Wesson revolver. The oxycodone tablets were in plain view on the bed inside the apartment, the gun was on a chair next to the door, covered by a towel, and the crack cocaine was hidden inside a fake Bible in a bookcase.**

**Mr. Cochran was then placed under arrest, and advised orally of his *Miranda* rights. Mr. Cochran did not expressly waive his rights, but immediately stated, in substance, that he had received the gun from a relative and that he had the drugs to supplement his income. Mr. Cochran was then taken to the police station. He was driven by Detective Carmona in the detective's truck, rather than in the police paddy wagon, because Mr. Cochran, who weighed well over 300 pounds at the time, was too large for the paddy wagon.**

*The Testimony of Defendant Thomas Cochran*

**Mr. Cochran testified on his own behalf. At the outset, the undersigned notes that Mr. Cochran admitted on cross-examination that he has used a false name in the past, and this fact undermines his credibility to some extent. In contrast to the above facts, Mr. Cochran testified that at the time the police arrived he was sitting in a chair in front**

---

[1] **Detective Perez could not recall whether he received the keys directly from Mr. Cochran, or from one of the other detectives. Detective Carmona testified that Mr. Cochran gave the keys directly to Detective Perez.**

of apartment # 4.  He saw a large black police officer (whose description matches that of Detective Maura) rush into the building, yell, "City of Miami Police!" and kick in the door to apartment # 2.  Mr. Cochran testified that the metal door to the apartment building is always kept locked, and that nobody ran into the apartment building before the police entered.  According to Mr. Cochran's initial testimony, the police officer then approached Mr. Cochran, and Mr. Cochran asked what was wrong.  Toward the end of his testimony, Mr. Cochran elaborated on this exchange, and testified that after he saw the police kick in the door to apartment # 2 he told the police that they were wrong to do to that since they did not have a warrant; he also testified that the police officer asked if Mr. Cochran had seen a skinny, black male run by, and Mr. Cochran told him no.  Mr. Cochran further testified that the policeman asked where he lived, and Mr. Cochran pointed to apartment # 4.  At that point, the policeman kicked in the door to apartment # 4.  The policeman discovered that Mr. Cochran did not live there, and then put Mr. Cochran against the wall, searched him and removed his key ring.  Mr. Cochran testified that he objected and told the policeman he couldn't do that, and the policeman said, "I'm the police, I can do what I want."  Mr. Cochran was not permitted to go inside his apartment, and was ordered to go outside of the apartment building.  When he arrived outside, he told the police that he was a dialysis patient and that he could not stand too long; after which they brought him a chair.  Following the search of his apartment, Mr. Cochran was placed under arrest and taken to police headquarters, where Mr. Cochran claims two large muscle-bound police officers ordered him to initial and sign the form described above, telling him he had to sign it so that nobody would break into his apartment and steal his belongings.  Mr. Cochran stated that he felt intimidated by the police presence at the apartment building, and that he felt that he was under arrest when they removed

his keys and ordered him outside.  Mr. Cochran testified that if he had been free to leave, he would have done so.  Finally, Mr. Cochran did not recall ever seeing Detective Perez.

As previously stated, the undersigned finds that the above testimony is not credible.  This determination is based upon the demeanor of Mr. Cochran during his testimony, as well as the fact that certain parts of it do not comport with common sense.  For example, Mr. Cochran testified that he did not see anybody run into the apartment building, and yet he also claims that while he was sitting in the breezeway inside the building, he was asked if he saw anybody run by.  It does not make sense that the detectives would testify that they were in hot pursuit of a suspect and kick in a door if that had not happened; nor that they would ask the Defendant if he had seen anybody run by.  In addition, Mr. Cochran claimed that he never saw Detective Perez, and that another detective had kicked in the door to apartment # 2; removed his keys; and, searched his apartment.  It does not make sense for the police to fabricate testimony concerning who performed the searches.  Moreover, if the metal door to the apartment complex was locked, as claimed by the Defendant, the police would not have been able to enter the building in the way that they indisputably did.  Finally, it does not make sense that the Defendant, who has an eleventh grade education, and who could read, according to the uncontradicted testimony at the hearing, would sign a clearly written consent form under the belief that it somehow protected his property.

The detectives on the other hand, testified consistently, did not appear to slant their testimony in favor of the government, and each acknowledged when he did not specifically recall an event.  By way of illustration, Detective Perez could not recall who handed him the keys to the Defendant's apartment, although Detective Carmona recalled that it was the Defendant who handed them directly to Detective Perez.  Detective

Carmona testified that after the Defendant had been read his *Miranda* rights following his formal arrest for the narcotics and gun found in his apartment, the Defendant did not expressly waive his rights before he made spontaneous incriminating statements. Detective Guas could not recall specifically how the persons inside the apartment building were told to leave, and he acknowledged that the Defendant was a suspect and that if the Defendant had tried to leave, Detective Guas would not have permitted this. It is also clear that the detectives did not collaborate to devise a consistent story–there were slight variances in their testimony concerning the sequence of events, the number of officers who entered the building, etc.

Thus, considering the totality of the evidence presented, and the demeanor of all the witnesses, the undersigned credits the testimony of the detectives concerning the events that transpired at the apartment building.

## IV.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

For the reasons set forth below, the undersigned finds that the Government has proven by a preponderance of the evidence that the Defendant freely and voluntarily consented to the entry into and search of his apartment.

### A.  Framework for Analysis

The issue of whether the Defendant voluntarily consented to the entry of the detectives into his apartment is a question of fact to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989). The government has the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. *Florida v. Royer*, 460 U.S. 491, 497 (1983); *United States v. Matlock*, 415 U.S. 164 (1974). In *Blake*, the Eleventh Circuit established the following factors to be used to assess the validity of

a consent to search: the custodial status of the consenting party; the presence of coercive police procedures; the extent and level of the person's cooperation with the police; awareness of the right to refuse to consent to the search; intelligence and education, and the belief that no incriminating evidence will be found.  *Blake*, 888 F.2d at 798.  Although knowledge of the right to refuse to consent is a factor to be considered, it is only one factor to be considered under the totality of the circumstances, and the Supreme Court has expressly stated that there is no presumption of invalidity if the government fails to establish such knowledge, and that no "extra weight" is to be given "to the absence of this type of warning."  *United States v. Drayton*, 536 U.S. 194, 206-07 (2002).  The same factors are relevant to the determination, under the totality of the circumstances, of whether consent to enter the premises has been voluntarily given.  However, the primary focus of the voluntariness determination in the context of consent to enter a residence, as opposed to consent to search, is whether the consent was prompted by a show of official authority.  In the case at bar, the consent to enter and the consent to search comprised a single event; and, therefore they are analyzed jointly.

Numerous cases have examined the voluntariness of consent.  For example, in *United States v. Ramirez-Chilel*, 289 F.3d 744, 747, 750-51 (11th Cir. 2002), the Court determined that consent to enter was voluntary despite fact that four agents approached the defendant's residence shortly before midnight, and requested admittance to determine whether there were any counterfeit documents located inside the residence, and the defendant then "yield[ed] the right-of-way to the officers" although he made no verbal response.  Similarly, in *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991), the Court rejected the argument that the defendant opened his door in response to "a show of official authority" where the agent and a backup officer, who were in plain

clothes and had weapons which were not drawn, knocked continuously for three to four minutes and called out to the occupants requesting them to open the door.  *Accord United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989) (defendant's consent was voluntary despite prior protective sweep, fact that defendant was arrested outside his house and brought inside in handcuffs, the presence of 14 armed agents, and the defendant's initial refusal to consent to the search of the entire premises, where the agents advised the defendant of his rights, and did not threaten the defendant, but merely stated that if he did not consent to search of entire house they would secure the premises and attempt to obtain a search warrant); *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983) (consent was voluntary where defendant had been stopped at gunpoint, frisked, placed face down on the road, since officers spoke in conversational tone, had reholstered their weapons, did not threaten defendant, and defendant was not handcuffed); *United States v. Juarez*, 573 F.2d 267, 273-74 (5th Cir. 1978)[2] (response of "That's fine" to DEA Agent's statement, "Well, I am going to have to search you," was a valid consent under the totality of the circumstances, including the fact that defendant was given *Miranda* warnings, and was a criminal defense attorney).

In holding that the consents given by the defendants in *Ramirez-Chilel and Tobin* were voluntary, the Court distinguished *United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986), where the defendant's consent was not voluntary because it was prompted by a show of official authority.  In *Edmondson*, FBI agents investigating a bank robbery surrounded the defendant's apartment, drew their weapons, and knocked on the

---

[2]  Decisions of the former Fifth Circuit Court of Appeals handed down prior to the close of business on September 30, 1981 are binding precedent within the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

door, yelling, "FBI. Open the door." Edmondson opened the door, stepped back and put his hands on his head, thereby submitting to an arrest. Under these circumstances, the Court held that these actions did not constitute consent for the agents to enter the apartment, but were only "an acquiescence to a show of official authority." *Id.* at 1515.

Similarly, in *United States v. Tovar-Rico*, 61 F.3d 1529 (11th Cir. 1995), the Eleventh Circuit ruled as a matter of law that the defendant's consent to search was not voluntary. The Court described the relevant facts as follows:

> The circumstances of the entry to Tovar's apartment are summed up by the magistrate judge as follows: "Defendant was first confronted by police officers that day when at least five officers knocked loudly at her door, announced their identity as police officers through the closed door, and requested permission to enter. Defendant then opened the door and the officers entered quickly with guns drawn to do the protective sweep." He concluded that under these circumstances, the defendant did not have any understanding of her right to refuse entry and demand a warrant.
>
> A protective sweep was conducted while Tovar was seated at the dining room table. She appeared to be calm. The officers entered each room. After this was completed, [an officer] asked Tovar for permission to again search the entire apartment because he thought that nothing had been found and no other people were in the apartment. He told Tovar that she did not have to permit the further search, but if she did not, the agents would come back with a search warrant. Tovar told the agents that she had just recently arrived and that she did not know what was going on. She agreed to the search and signed a written consent form. The magistrate judge found the consent involuntary. He opined that Tovar had already observed officers explore every room in the apartment and could not reasonably have known that she could still refuse a search. We agree. We entertain no doubt that Tovar opened the door in response to a "show of official authority" and cannot be deemed to have consented to the agents' entry or to have voluntarily consented to the search. . . . "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that is was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority."

14

>*Florida v. Royer*, 460 U.S. 491, 497 (1983).

*Id.* at 1535-36.

As these cases make clear, the issue of whether a defendant has voluntarily consented to the search of his residence is a fact intensive inquiry determined by the totality of the circumstances.

### B. Conclusions of Law

Applying the above factors to the case at bar, the undersigned concludes that Mr. Cochran freely and voluntarily consented to the search of his apartment. Although there was a strong police presence at the apartment building, Mr. Cochran had not been handcuffed or formally arrested at the time he was asked for consent to the search. It was mid-day, he was in an open parking area in front of the apartment building, he was with other civilians in that area, he had been provided with a chair to sit on, and had engaged in casual conversation for approximately 20 minutes before he was asked for his consent. He was in his late forties, had an eleventh grade education, and was able to understand and communicate with the officers. His testimony and demeanor in the courtroom demonstrate his ability to understand and answer questions. Mr. Cochran was calm and cooperative throughout the encounter. The police did not have their guns drawn, and did not in any way threaten the Defendant. Moreover, he was specifically advised that he had the right to refuse to consent to the search, and he signed a form which specifically acknowledged this right, and authorized the search. Mr. Cochran did not merely acquiesce to the authority of the police.

The undersigned recognizes that the nature of the police arrival on the scene, including the fact that they forcibly entered another apartment in the building, creates an element of coercion. Under the totality of the circumstances, however, the coercive

nature of the police presence was not sufficiently severe to undermine the voluntariness of the defendant's consent. The circumstances in the case at bar are far from the coercive presence in *Garcia* and *Espinosa-Orlando,* which the court found did not undermine the voluntariness of the consents given in those cases. The undersigned recognizes, however, that Mr. Cochran must have been aware that the police would find the oxycodone, and likely the gun, during a search of his apartment. However, this is only one factor in the analysis, and does not alter the conclusion, under the totality of the circumstances that the Defendant freely and voluntarily consented to the search. This conclusion is especially reinforced by the fact that the consent to search form signed by the Defendant expressly advises him of the right to refuse consent.

In sum, the undersigned finds and concludes that the Defendant, Thomas Cochran, freely and voluntarily consented to the search of his apartment, and therefore, the ensuing search was legal and the Motion to Suppress should be denied.

V. <u>CONCLUSION</u>

Based upon the determination that the Defendant freely and voluntarily consented to the search of his apartment, it is hereby

**RECOMMENDED** that the Motion to Suppress (DE # 24) be **DENIED**.

Unless otherwise altered by the District Judge, the parties will have fourteen days to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned. Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein. *LoConte v. Dugger*, 847 F.2d

745 (11th Cir. 1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND ORDERED** in chambers in Miami, Florida, on February 8, 2012.

_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**


Copies furnished to:
The Honorable Patricia A. Seitz, United States District Judge
All counsel of record via CM/ECF